UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARIN BJORK,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF PLACER THE DISTRICT ATTORNEY'S OFFICE, and DOES 1 through 10, inclusive,<br><br>Defendants. | No. 2:14-cv-01983-MCE-EFB<br><br>**MEMORANDUM AND ORDER** |

By way of this action, Plaintiff Karin Bjork ("Plaintiff") seeks damages and equitable relief from her former employer, Defendant County of Placer ("Defendant"), for injuries sustained as a result of her demotion and alleged constructive termination. In the operative complaint, Plaintiff sets forth causes of action for: (1) retaliation under California's Fair Employment and Housing Act, Cal. Gov. Code § 12940 et seq., ("FEHA"); (2) gender discrimination in violation of 42 U.S.C. § 2000e ("Title VII") and FEHA; and (3) failure to correct the foregoing retaliation and discrimination in violation of California Government Code § 12940(k). ECF No. 30. Presently before the Court is Defendant's Motion for Summary Judgment, which, for the following reasons, is GRANTED in part and DENIED in part. ECF No. 69.[1]

---

[1] Having determined that oral argument would not be of material assistance, the Court ordered this Motion submitted on the briefs in accordance with E.D. Local Rule 230(g).

# BACKGROUND[2]

Plaintiff was a prosecutor with the Placer County District Attorney's office from 1991 through June 2014. She became a Supervising Deputy District Attorney ("SDDA") during her tenure and oversaw both the Family Protection Unit ("FPU") and the Misdemeanor/DUI Unit ("MDU") for years. On October 6, 2012, however, Plaintiff was demoted.

## A. Doe III

According to Defendant, the demotion was justified because Plaintiff impermissibly opposed management's decision to terminate the employment of "Doe III," a twenty-year attorney and seven-year prosecutor that Defendant contends had a significant disciplinary record. Both the District Attorney ("DA"), Scott Owens, and Assistant District Attorney ("ADA"), Jeff Wilson, who ran office operations under the DA, purportedly informed Plaintiff that she needed to monitor Doe III closely both as to his work product and as to his behavior. In sum, Defendant contends that Doe III was mishandling cases and behaving unprofessionally in court. Despite Doe III's purported shortcomings, Plaintiff nonetheless rated him as "meets standard" overall in a performance evaluation she sent to Wilson in April 2012.

Eventually, on September 27, 2012, after Owens had made the decision to terminate Doe III's employment, Plaintiff met with Wilson and an investigator. According to Defendant, Plaintiff strongly opposed management's plan in that regard, to the point of acknowledging that she would be Doe III's star witness against management in Doe III's anticipated civil service appeal of his termination order. Because of her direct opposition to Owens' decision to terminate Doe III's employment, and because of her support for Doe III at the expense of the novice prosecutors in the MDU, Owens contends he decided to remove her from his management team. On October 4, 2012, Owens thus met with Plaintiff to inform her of his decision to remove her "without cause" from her at-

---
[2] The following facts are taken, at times verbatim, from the parties' briefs.

will position as a SDDA. Plaintiff returned to her prior position of DDA IV and was assigned to the Felony Unit.

Plaintiff's version of the facts differs. According to Plaintiff, at the time of Owens' election, the DA's office management team consisted of ADA Owens and SDDAs Bjork, Dragland and Peterson. Wilson was a Senior DDA. Employees were surprised when Owens selected the younger Wilson for the ADA position over SDDA Dragland, who was the main point of contact for HR from the DA's Office and had been a supervisor and seasoned investigator for many years. The person in the ADA position was responsible for the day-to-day management of employees and the performance evaluations for supervisors. The ADA was also tasked with reviewing all performance evaluations and was responsible for knowing County policies and procedures. Despite these requirements, Wilson had no management experience.

Moreover, according to Plaintiff, Wilson abused his position as ADA by using support staff and DDAs to monitor employees he had targeted and to provide information for him to use against those targeted individuals. For example, one human resources representative purportedly took pictures of Plaintiff having lunch with a DDA and texted it to Wilson. That same person also texted Wilson during the funeral of a former district attorney chief investigator that she was sitting behind Plaintiff. Plaintiff similarly alleges that Wilson would hold court with the younger more impressionable attorneys in the office and used those employees to spy and monitor the conduct of the individuals he was targeting.

As to the circumstances of Doe III's termination, Plaintiff's version differs as well. According to Plaintiff, Doe III's legal career had involved non-jury-trial work over the twenty-year period between 1985 and 2005. Consequently, he had limited criminal jury trial exposure when he was assigned to the DA's felony team in late 2008. In 2011, however, he began to work under Plaintiff's supervision in the MDU and had an excellent year. By early 2012, Doe III had approximately twenty months experience handling misdemeanor cases. Plaintiff argues that Doe III had an exceptional trial record in the

unit with over 19 guilty verdicts.

In April 2012, however, Wilson purportedly circumvented Plaintiff's authority and gave Doe III a counseling memorandum directly. According to the memorandum, Doe III was being counseled for standing inappropriately in the office in his running shorts after a post-lunch run two months prior. The gist of the memorandum seemed to be that Doe III's posture made it possible to see up the leg of his shorts.

Although this memorandum was issued approximately the same time that Plaintiff submitted her performance evaluation of Doe III's work to Wilson, she received no feedback from Wilson on her appraisal for more than five months. Moreover, in the interim, Wilson began to pay closer attention to Doe III. Wilson scrutinized his work, pulling files from Doe III's office and having other employees observe Doe III's trials and report back to him. Doe III eventually expressed concerns to Plaintiff that Wilson was targeting him.

In July 2012, Plaintiff contends that Wilson called Doe III into his office and asked if he was burned out because he had been practicing law for a long time and was currently going through a divorce. The following month, while Plaintiff was on leave, Wilson purportedly utilized another attorney to inventory Doe III's office and to monitor his Facebook account. Wilson then made an office-wide intercom announcement requiring Doe III to return to the office. Just a few minutes later, Wilson issued an office-wide email removing Doe III from DUIs and moving him back to misdemeanors. According to Plaintiff, this conduct was intended to embarrass Doe III.

Plaintiff further contends that ultimately, when she returned from her aforementioned leave, she was summoned to Wilson's office on September 27, 2012, where she was told Wilson intended to terminate Doe III and wanted to know if she was on board. Wilson had never discussed any performance deficiencies or corrective action as to Doe III with Plaintiff. Moreover, according to Plaintiff, Doe III had not received a performance evaluation since 2009, which indicates under County policies that his performance was satisfactory. From 2005 through 2009, Doe III received a met and

exceeding evaluation each year. In fact, he had never received a negative evaluation, so Plaintiff viewed any termination as in violation of the County's progressive discipline policies.

Plaintiff advised Wilson that because she had observed Doe III performing satisfactorily, she needed time to review his files in order to verify the additional information Wilson was offering. In addition, Plaintiff purportedly explained that Wilson's articulated basis given to terminate Doe III was based on conduct that younger employees in the office had also engaged in without discipline. As a result, Plaintiff did not support discipline and suggested instead less severe remedial options that would provide Doe III the opportunity to correct any problems. Plaintiff contends she opposed Wilson's and Owen's attempts to discriminate against Doe III. In response, Wilson directed the information technology staff to block Plaintiff's database access to Doe III's cases so she was unable to gather additional information. She was also, as indicated previously, removed from her management position and demoted to DDA IV with the felony unit. On November 6, 2012, Plaintiff sent a letter to Owens and Wilson expressly advising that she believed her demotion was the result of discrimination. She thus demanded reinstatement, which request was denied.

After her transfer to the felony unit, Plaintiff contends that she was receiving cases that were beneath her level of experience, but Defendant argues instead that after a brief transition, she was given a full load of felony cases. Defendant reasons that this transition was appropriate because Plaintiff had not been a trial prosecutor for over a decade, and had not been in the Felony Unit for even longer. For those reasons, and because Defendant apparently believed that some of Plaintiff's decisions were questionable, she allegedly was not assigned to the most important felony cases.

**B.    The Duran Sweep**

Subsequently, in October 2013, a parolee and Sureno gang member, Sammy Duran ("Duran"), was in an altercation with federal agents and Roseville, California, police officers. Multiple officers were shot and Duran was eventually taken into custody.

5

The following month, on November 18, 2013, Defendant contends that because Plaintiff was concentrating on looking for a new job, she lost her focus on her current work, and made a very serious mistake. According to Defendant, Plaintiff disclosed identifying details of a major police operation involving over fifty officers, linking it directly to Duran, whose associates were being targeted by that sweep. Plaintiff disclosed the operation to an attorney working for the same firm in the same building as counsel for Duran. That operation was scheduled to take place two days later, and Plaintiff's disclosure, and subsequent response to the investigation into that disclosure, led to disciplinary proceedings that Ms. Bjork asserts were retaliation against her for having complained of alleged gender discrimination and/or retaliation.

Plaintiff does not deny that she disclosed the fact that a police operation had been scheduled in the wake of the Duran shooting. She does, however, offer additional material details. First, according to Plaintiff, an officer scheduled to testify at one of Plaintiff's preliminary hearings on the day of the operation advised her he would be unable to testify so that he could participate in the action. The sweep was to take place on a Wednesday, which was the same day that Roseville forces conducted training. According to Plaintiff, because it was a normal training day and because that officer spoke about the operation freely in a courthouse hallway in front of members of the public, taken together, she was led to believe that the referenced operation was intended for training purposes—to learn from mistakes made trying to apprehend Duran. Given the officer's unavailability, Plaintiff thus put together and filed a motion to continue the preliminary hearing detailing what the officer had told her.

Plaintiff further alleges that Wilson was the lead prosecutor on the Duran matter and worked with law enforcement to secure the requisite warrants and to coordinate the November operation. However, despite the fact that the sweep conflicted with the preliminary hearing calendar, neither Wilson nor Owens purportedly advised the affected DDAs of the conflict, the reason for the officers' unavailability, or that efforts needed to be undertaken to avoid tipping off Duran or any of his associates. According to Plaintiff,

6

Wilson did pass this critical information along to several male co-workers, but not to her or to a female co-worker who also filed a motion similar to Plaintiff's. After an investigation that Plaintiff contends was tainted in a number of respects, Plaintiff was served with a Notice of Proposed Disciplinary Action on December 27, 2013, and an Order of Disciplinary Action on January 28, 2014, calling for Plaintiff's termination given her conduct in disclosing the Duran operation and for purportedly being dishonest in her claim that she thought the operation was for training purposes. Plaintiff's effective date of termination was January 31, 2014.[3]

Plaintiff was thereafter served with a Notice of Additional Charges, adding further claims that Plaintiff had been dishonest during the County's investigation. After a five-day hearing, the Civil Service Commission eventually overturned the decision to terminate Plaintiff and instead ordered that she be suspended for 120 days and be demoted from DDA IV to DDA III. The Commission sustained Plaintiff's objection to the Additional Charges and ruled that the County could pursue those in a separate proceeding.

Owens, who Defendant claims strongly believed Plaintiff had been deceptive throughout the termination proceedings, thereafter signed a new Order of Discipline dated June 13, 2014, containing those additional charges and advising that Owens was again seeking to terminate Plaintiff. Plaintiff, who contends that she understood Defendant would not stop efforts to terminate her and destroy her reputation such that it would be very difficult to continue to practice law, thereafter resigned on June 26, 2014.

///
///
///

---

[3] Plaintiff points out that another co-worker also mentioned the operation in a motion to continue, but was never disciplined. Defendant counters, however, that the lack of discipline stemmed from the fact that the co-worker did not specifically link the operation to Duran and that therefore the attorney's conduct was not similarly situated. Another co-worker who referenced the operation in his own motion to continue specifically as a "training" operation was eventually (approximately one year later) suspended for three (3) days.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying the summary judgment standard to a motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "However, if the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden." In re Brazier Forest Prods. Inc., 921 F.2d 221, 223 (9th Cir. 1990). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

///

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.
///

Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

Defendant moves for summary judgment on the following bases:

1. When demoted from her supervising DA position on October 6, 2012, Ms. Bjork was not an employee entitled to protection under Title VII;

2. Ms. Bjork never engaged in protected conduct prior to her October 6, 2012 demotion;

3. The undisputed facts show that Ms. Bjork was demoted from her Supervising DA position on October 6, 2012 for a non-discriminatory reason; i.e. her clear and direct opposition to management's plan to terminate her subordinate, Doe III;

4. The December 27, 2013 Notice of Proposed Disciplinary Action (NOP) brought against Ms. Bjork, and all subsequent discipline, was based on non-retaliatory and non-discriminatory reasons related to her disclosure of confidential information;

5. Instead of standing and fighting the disciplinary charges before the Placer County Civil Service Commission, Ms. Bjork voluntarily resigned, so she therefore cannot claim constructive discharge.

Mot., ECF No. 76, at 1. Defendant is correct that Plaintiff does not qualify as an "employee" under Title VII with respect to her demotion only, but the rest of Defendant's arguments are not well taken as they turn on the resolution of material factual disputes.

Title VII defines an "employee" as follows:

> The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

///

42 U.S.C. § 2000e(f). In Ramirez v. San Mateo County Dist. Attorney's Office, the Ninth Circuit held that a prospective deputy district attorney was a member of the district attorney's personal staff, and thus not an employee, where the deputy "serve[s] at the pleasure of their superior, the district attorney, who has plenary power of appointment and removal" and where the deputy is not subject to the protections of the civil service system. 639 F.2d 509, 513 (9th Cir. 1981). Defendant has offered undisputed evidence that all of the foregoing are true with respect to the position Plaintiff occupied prior to her October 6, 2012, demotion. Plaintiff has not offered any competing evidence or presented any binding authority to the contrary nor has the Court located any. Accordingly, Plaintiff is exempt from the protections of Title VII as to her demotion only.[4]

That said, whether Plaintiff engaged in protected conduct before her demotion (i.e., at her September 27, 2012, meeting with Wilson), whether she was demoted for non-discriminatory and non-pretextual reasons, and whether the December 2013 Notice of Proposed Discipline (Wilson's attempt to terminate Plaintiff) was non-retaliatory and non-discriminatory all turn on the parties' conflicting view of the facts. Even assuming Defendant had offered sufficient evidence to sustain the motion in its favor, Plaintiff's opposition has identified more than enough factual disputes to persuade the Court otherwise. Resolution of these issues turns, in no small part, on the credibility of the competing parties and witnesses as to what transpired in particular meetings, but also as to who was disciplined for what and why others were not treated similarly despite purportedly engaging in similar conduct. Given the record before the Court, and making all inferences in Plaintiff's favor, it is absolutely conceivable that a jury could find for Plaintiff.

Finally, whether Plaintiff's resignation amounts to a constructive discharge is likewise not amenable to resolution on this record because the question requires a finder of fact to evaluate the totality of the circumstances. See Knappenberger v. City of

---

[4] Defendant does not challenge Plaintiff's status as an employee under FEHA, so Plaintiff's demotion claim remains viable under California law.

11

Phoenix, 566 F.3d 936, 941 (9th Cir. 2009).  While Defendant makes much of a civil servant's ability to stand and fight charges against her, the simple fact is that Plaintiff had already fought long and hard against her termination, only to face the same proposed disciplinary action again almost immediately following her reinstatement.  A reasonable inference could be that Defendant would never stop in its campaign to terminate Plaintiff.  This begs the question how many times an employee must be expected to answer to charges before the futility of one's actions is enough to warrant the steps Plaintiff took here.  That is, of course, a question for another day.  Suffice it to say for now, however, that given the record before this Court and the fact-intensive nature of Plaintiff's claims, this case is going to trial.

**CONCLUSION**

For the reasons stated above and consistent with the foregoing, Defendant's Motion for Summary Judgment (ECF No. 69) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

Dated:  November 30, 2017

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE